1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

EUREKA DIVISION

7

8       SALIHA B.,                                    Case No.  19-cv-08253-RMI

9                        Plaintiff,
                                                      **ORDER ON CROSS MOTIONS FOR**
10              v.                                    **SUMMARY JUDGMENT**

11      ANDREW SAUL SOCIAL SECURITY                   Re: Dkt. Nos. 23, 26
        ADMINISTRATION,
12
                         Defendant.
13

14          Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her

15      application for supplemental security income under Title XVI of the Social Security Act. *See AR*

16      at 27, 131.[1] Plaintiff's request for review of the ALJ's unfavorable decision was denied by the

17      Appeals Council (*see id*. at 1), thus, the ALJ's decision is the "final decision" of the

18      Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g),

19      1383(c)(3). Both Parties have consented to the jurisdiction of a magistrate judge (dkts. 9 & 13),

20      and both parties have moved for summary judgment (dkts. 23 & 26). For the reasons stated below,

21      Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

22                                      **LEGAL STANDARDS**

23          The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

24      conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set

25      aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal

26      error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

27

28      _____

        [1] The Administrative Record ("*AR*"), which is independently paginated, has been filed in several parts as a
        number of attachments to Docket Entry #19. *See* (dkts. 19-1 through 19-9).

United States District Court
Northern District of California

"substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On October 28, 2015, Plaintiff filed an application for supplemental security income, alleging an onset date of July 31, 2002. *See AR* at 27. As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on November 23, 2018. *Id*. at 27-36. The Appeals Council denied Plaintiff's request for review on November 25, 2019. *See id*. at 1-4. The following month, on December 19, 2019, Plaintiff sought review in this court. *See* Compl. (dkt. 1).

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff, now 57 years old, was born in Afghanistan in 1964; and, as a very young person, her life became marked by chaos and tragedy when her country found itself engulfed in a 10-year war following an invasion by the Soviet Union. *See* Pl.'s Mot. (dkt. 23) at 7; *see also AR* at 431. The horrors of this war resulted in the deaths of about 15,000 Soviet soldiers and more than 1 million Afghan civilians. *See* Bloch, Hannah, "A Look At Afghanistan's 40 Years Of Crisis — From The Soviet War To Taliban Recapture," NPR, Aug. 31, 2021.[2] However, the human toll experienced by the Afghan population was not limited to the million or so lives that were lost; even putting aside that staggering death toll, the Afghan-Soviet war "resulted in one of the biggest

---

[2] Available at https://www.npr.org/2021/08/19/1028472005/afghanistan-conflict-timeline (last checked 09/10/2021).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  humanitarian crises of modern history, with over five million refugees fleeing to Pakistan and Iran

2  and another two million displaced internally." *See* Bhutta, Zulfiqar Ahmed, *et al*., "Children of

3  War: the real casualties of the Afghan conflict," British Medical Journal (Clinical research ed.),

4  Vol. 324, pp. 349-52, (February 9, 2002).[3] Midway through the course of this war, Plaintiff

5  became one of those displaced persons; and, after escaping her homeland, she eventually entered

6  the United States as a refugee in 1988. *See AR* at 431. Like many victims of war, Plaintiff became

7  afflicted with various conditions including posttraumatic stress disorder ("PTSD"), major

8  depressive disorder, and anxiety disorder. *See AR* at 10, 14, 435. As a result of the combined

9  effects of these and other impairments, Plaintiff submits that she has had a limited work history

10  that has resulted in no earnings in the last 15 years – in fact, the most recent earnings that Plaintiff

11  garnered were in 2002, and even those earnings were below the threshold that would qualify the

12  work as "substantial gainful activity." *See* Pl.'s Mot. (dkt. 23) at 7; *see also AR* at 29 (the ALJ

13  found that "[t]he claimant last worked in 2002, when she had earnings of $4,341.00, which was

14  below the substantial gainful activity level. [] She has not had any earnings in the past 15 years.").

15  *Medical Records and Opinion Evidence from Treating Sources*

16      A significant portion of the diagnostic and opinion evidence from Plaintiff's treating

17  sources come from Bhupinder Bhandari, M.D., who has served as Plaintiff's primary care

18  physician for the better part of the last 20 years. *Id*. at 10.[4] In mid-2015, Plaintiff was observed as

19  suffering from impaired glucose tolerance (culminating in a diagnosis of borderline diabetes

20  mellitus) as well as being diagnosed with menorrhagia (excessive menstruation) that would last as

21  long as 10 days per episode coupled with dizziness and fatigue. *Id*. at 409, 418. As to the

22  menorrhagia, Kalaokalani Chandler, M.D., confirmed Plaintiff's history of "[d]ysfunctional

23  uterine bleeding," while opining that the cause was a "probable submucosal fibroid and

24  endometrial polyp." *Id*. at 406. Consequently, Plaintiff was admitted to the hospital for a

25

26  [3] Available on the website of the National Library of Medicine at:
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1122273/ (last checked 09/10/2021)

27

28  [4] Dr. Bhandari's accolades include the facts that he is a Diplomate of the American Board of Internal
    Medicine, a fellow of the American College of Physicians, and a Member of the (U.K.) Royal College of
    Physicians. *See id*. at 476.

hysteroscopy in September of 2015. *Id*. at 406. The hysteroscopy revealed that Plaintiff's excessive menstruation (which caused her to suffer dizziness and fatigue) was due to an enlarged uterus "with at least 2 small myomatous nodules . . . [and] 3 endometrial polyps," which Dr. Chandler proposed to address with a polypectomy and a myomectomy in order to remove the abnormal growths. *Id*. at 410-11, 413-14.

In mid-2016, Plaintiff underwent an array of x-ray diagnostic imaging in order to investigate the causes of persistent pain in her lower back and in both knees. *Id*. at 466-69. In the course of an osteoporosis screening, Andrew Kwai, M.D., found that "[t]he average bone mineral density [in Plaintiff's lumbar spine] from L1 through L4 . . . is 2.5 standard deviations below the expected mean value for a young adult female [member of the] population." *Id*. at 468. Similarly, Dr. Kwai found that the same condition in Plaintiff's left hip was nearly 1 standard deviation below the mean expected value of a woman her age. *Id*. Dr. Kwai concluded that Plaintiff's diminished bone mass was consistent with osteopenia. *Id*. Further, based on Plaintiff's diminished and degraded bone density of the lumbar spine, Dr. Kwai concluded that Plaintiff's "10-year risk of major osteoporotic facture is 11%." *Id*.[5] Dr. Kwai also observed spina bifida (a type of neural tube defect) in Plaintiff's lumbar spine at L6. *Id*. at 482.

Due to persistent left knee pain lasting for months on end, and given that fact that x-ray imaging had not shown any "significant marginal osteophytosis" (*see id*. at 530), Dr. Bhandari referred Plaintiff to Gina Midmore, M.D., for MRI imaging in October of 2017 and again in January of 2018. *Id*. at 513-14. Dr. Midmore observed various incidents of structural damage in Plaintiff's left knee, and catalogued them as such: "[t]here is marginal osteophyte formation at the patellofemoral articulation and small marginal osteophyte formation at the mid medial femoral condyle and lateral tibial plateau . . . [as well as] a large knee joint effusion and a moderate Baker's cyst extending superiorly . . . [and] several popliteal lymph nodes, more than typically identified."

---

[5] Osteoporosis treatment becomes necessary when the ten-year risk of fracture exceeds the 3% threshold. *See generally* Unnanuntana, Aasis, *et al.*, "The Assessment of Fracture Risk," Journal of Bone and Joint Surgery, Vol. 92, Issue 3, pp. 743-53 (March 2010).
Available on the website of the National Library of Medicine at:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2827823/ (last checked 09/10/2021)

1    *Id*. In short, Dr. Midmore diagnosed three left knee defects: (1) large knee joint effusion and

2    moderate Baker's cyst; (2) full-thickness cartilage loss from the patellar medial facet with

3    otherwise generalized thinning and fissuring of the patellofemoral cartilage; and, (3) mild

4    prominence of the popliteal lymph nodes. *Id*. at 514.

5         The practical consequences of the findings entered by Dr. Kwai (regarding Plaintiff's

6    lumbar spine and left hip) and by Dr. Midmore (regarding Plaintiff's left knee) were corroborated

7    and independently identified when Norman Cheung, M.D., referred Plaintiff for physical therapy

8    at the Tri-City Physical Therapy Clinic. *See id*. at 577-80. In the course of this evaluation, Vanessa

9    C. Arroyo, P.T., observed that "there has been swelling in the knee with a lot of pain," coupled

10   with the fact that Plaintiff cannot walk for more than 20 minutes or sit on the floor with her knees

11   bent because the pain is aggravated by standing, walking, negotiating stairs, and while

12   transitioning from a seated position to standing. *Id*. at 578. A measurement of Plaintiff's mid-

13   patellar knee girth revealed that her left knee was a 1/2 inch larger than her right knee. *Id*.

14   Therapist Arroyo then observed that Plaintiff "demonstrates decreased strength in the [quadriceps]

15   and [hamstring] leading to [a] lack of full extension and flexion at [the] knee and hence,

16   [Plaintiff's] problems during walking . . . [and that Plaintiff also] demonstrates overall weakness

17   in [her left] hip and knee musculature along with crepitus[6] in her [left] knee which may be

18   contributing to her pain in sit to stand [movements] from [the] floor." *Id*. at 579. In short,

19   Therapist Arroyo observed that Plaintiff has decreased strength coupled with pain and swelling in

20   her left knee, as well as decreased strength and tightness in her left hip. *Id*. at 580. Several months

21   later, after continued physical therapy, and despite marginal improvement due to therapeutic

22   exercise, cryotherapy, and electrical stimulation, Plaintiff's problem list associated with her left

23   knee and hip was unchanged. *See id*. at 600, 604, 608, 610, 612, 614. Indeed, in April of 2018,

24   Plaintiff's physical therapist observed that Plaintiff presents with edema (swelling caused by

25   excess fluids trapped in tissues) in her left leg "which causes pain and stiffness with standing and

26   walking." *Id*. at 610. Additionally, in May of 2018, Plaintiff's physical therapists noted elbow

27

28   ———————————
     [6] A grating sound or sensation produced by friction between bone and cartilage or the fractured parts of a
     bone.

United States District Court
Northern District of California

United States District Court
Northern District of California

pain, decreased range of motion, as well as muscle tension and swelling on both forearms which "are contributing to pain with gripping and lifting tasks due to deficits in strength and swelling in forearms." *Id*. at 618. The resulting diagnosis for the pain and decreases in range of motion was arthritis. *Id*. at 622.

During this same period of time, Dr. Bhandari opined that Plaintiff's disability is rooted, *inter alia*, in her anemia, her esophageal reflux disease, her arthralgia (joint pain), and her depression. *Id*. at 477. Due to the combined effects of these and other conditions, in August of 2016, Br. Bhandari addressed correspondence to the Social Security Administration in which he opined that "[Plaintiff] is currently unable to work. Please extend her [m]edical benefits." *Id*. at 485, 492. Nearly two years later, in February of 2018, Dr. Bhandari wrote a similar letter through which he expressed that Plaintiff "has many chronic medical conditions including arthritis of the knee, hypertension, migraines, and depression." *Id*. at 572.

More than four months before the issuance of the ALJ's opinion, Plaintiff submitted two documents which contained Dr. Bhandari's opinions regarding the limitations experienced by Plaintiff's mental and physical faculties due to the combination of her various impairments. *See id*. at 644-48, 651-53. At the outset, Dr. Bhandari noted that the bases for his opinions as: observations made during his 20-year treating relationship with Plaintiff (in the course of which Dr. Bhandari would see Plaintiff for treatment approximately every two months); a review of the entirety of Plaintiff's medical history; and, a review of his own progress and office notes. *See id*. at 644, 651.

Regarding Plaintiff's mental impairments, Dr. Bhandari diagnosed her with depression and anxiety and noted that these impairments can be expected to last more than 12 months. *Id*. at 644. He also noted that Plaintiff's mental health impairments exacerbate her pain and the other symptoms associated with her physical impairments. *Id*. He then listed the signs and symptoms of Plaintiff's depression and anxiety as including: decline in complex attention, executive function, learning, memory, language, perceptual-motor faculties, and social cognition; diminished interest in almost all activities; sleep disturbances; decreased energy; thought and concentration difficulties; frequent distractibility; persistent fatigue; muscle tension; panic attacks followed by

6

persistent worry about the panic attacks themselves or the consequences thereof; detachment from social relationships; difficulty organizing tasks; depressed mood; appetite disturbance resulting in weight change; feelings of guilt or worthlessness; irritability; distress or suspicion of others; difficulty sustaining attention; and, mood and behavioral disturbances. *Id*. at 645. As to Plaintiff's residual abilities, Dr. Bhandari defined "moderate limitation" such that would preclude Plaintiff's performance by 20% in a given 8-hour workday. *Id*. at 646. In this vein, he opined that Plaintiff would be precluded from properly functioning for 20% of each workday in all of the four broad categories of mental functioning – to wit: understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and, adapting or managing herself. *Id*. at 646-47. Further, Dr. Bhandari explained that Plaintiff's depression and anxiety result in persistent apathy which causes a low-energy state that serves as the foundation for these opined limitations. *Id*. at 647. He also explained that Plaintiff's depression and anxiety symptoms cause her to experience difficulty attending appointments, taking medications with the requisite regularity, and even the consistency with which she engages treatment – which, of course, explains *why* Dr. Bhandari concluded that Plaintiff's mental health symptoms operate to worsen the effects of her physical impairments and illnesses. *Id*. at 648. At bottom, he concluded that Plaintiff's depression and anxiety disorders will result in her missing more than 4 days of work per month, as well as resulting in Plaintiff being off-task for more than 30% of the time in the course of any given work day. *Id*. at 647-48.

In the domain of physical impairments, Dr. Bhandari noted that Plaintiff's arthritis, anemia, and esophageal reflux disease have persisted for 15 years, and combine to result in a host of work-related limitations. *Id*. at 651-52. He opined that even on an occasional basis (less than 1/3 of an 8-hour workday), Plaintiff's ability to lift objects is limited to those weighing less than 10 pounds. *Id*. at 651. Dr. Bhandari added that in the course of any work day, Plaintiff would be limited to alternating between sitting, standing, or walking to relieve discomfort every 30 minutes; that she would not be able to either stand or sit for more than 30 minutes before needing to change positions; that she could not be expected to walk for more than a 20 minute period; that Plaintiff would need to be free to shift at will between sitting, standing, and walking; and, that Plaintiff

United States District Court
Northern District of California

would need to be permitted to lie down and recline at unpredictable intervals during any given work shift. *Id*. at 651-52. He specifically opined that Plaintiff's need to recline could occur as frequently as twice per hour. *Id*. at 652. While opining that Plaintiff could occasionally climb stairs, Dr. Bhandari noted that she could never engage in maneuvers that require twisting, stooping, crouching, or climbing ladders. *Id*. He also noted that due to her arthritic conditions, Plaintiff is limited in her abilities in the domains of reaching, handling, fingering, feeling, pushing, and pulling. *Id*. Lastly, Dr. Bhandari opined that Plaintiff's arthritis, anemia, and esophageal reflux disease would combine to cause her to be absent from work on more than three occasions per month; and that the interference, caused by the necessity of her consumption of pain medication, with her ability to be present and concentrate on work activities would be severe (meaning that it would preclude proper functioning between 15% and 33% of the time). *Id*. at 653. Thereafter, in August of 2019, several months after the issuance of the ALJ's adverse decision, Plaintiff submitted an updated document to the Appeals Council through which Dr. Bhandari expressed these same conclusions, but attended with a few greater details regarding, for example, Plaintiff's arthritic issues with her left knee, hip, and lumbar spine. *See generally id*. at 10-12.

Another piece of evidence that Plaintiff submitted to the Appeals Council contained the findings and conclusions of Veiss Zendieh, LMFT. *See id*. at 14-18. Therapist Zendieh, who began treating Plaintiff in late 2018, noted a "long history of depression and PTSD." *Id*. at 14. Following a number of weekly sessions, Therapist Zendieh diagnosed Plaintiff with major depressive disorder and PTSD, and assessed a Global Assessment of Functioning ("GAF") score of 41-50, attended with a notation that Plaintiff's "symptoms of depression are severe." *Id*. Manifesting a great deal of overlap with Dr. Bhandari's opinions, Therapist Zendieh opined that the effects of Plaintiff's major depressive disorder include: significant deficits in complex attention, executive function, learning and memory, language, perceptual-motor function, and social cognition; diminished interest in almost all activities; sleep disturbance; decreased energy; difficulty concentrating or thinking; frequent distractibility; persistent fatigue; involuntary and time-consuming preoccupation with intrusive and unwanted thoughts; detachment from social relationships; excessive need to be cared for; difficulty organizing tasks; significant difficulties in

United States District Court
Northern District of California

learning and applying academic skills; depressed mood; feelings of guilt and worthlessness; irritability; feelings of inadequacy; difficulty sustaining attention; involuntarily re-experiencing traumatic events; mood and behavioral disturbances; as well as, persistent alteration in eating or eating related behavior resulting in changes in food consumption that significantly impairs physical or psychological health. *Id*. at 15. Unlike Dr. Bhandari, however, with regard to the consequence of these symptoms, Therapist Zendieh opined that Plaintiff's limitations in the four broad categories of mental functioning were all extreme (meaning that Plaintiff has no appreciable ability to function in the domains of understanding and applying information, interacting with others, concentrating and maintaining pace, or adapting and managing herself). *Id*. at 16-17.

Therapist Zendieh also noted that Plaintiff has suffered from depression and PTSD for many years, rooted in the fact that "she is a war victim as well." *Id*. at 17. It was also noted that while Plaintiff "shows very slow progress in therapy [], she needs therapy to manage her symptoms and not get hospitalized." *Id*. Plaintiff's therapist also noted that Plaintiff "has limited ability to complete any tasks, [and] she is isolated and unable to form social relations." *Id*. Consequently, Therapist Zendieh concurred with Dr. Bandhari's assessment that Plaintiff's symptoms and their limitations would see to it that she would miss 4 or more days of work per month, and that she should be expected to be off-task (when she is not absent) for more than 30% of any given work day. *Id*. It is also noteworthy that Therapist Zendieh found that whenever Plaintiff hears news related to war in Afghanistan, her symptoms worsen. *Id*. at 18. Plaintiff's therapist also noted that Plaintiff's depressive disorder and PTSD are attended with: (1) medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that are ongoing and that diminish the symptoms and signs of the mental disorder; and yet, (2) Plaintiff shows only marginal adjustment, that is, she has a minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life. *Id*. Lastly, Therapist Zendieh explained that Plaintiff's "constant depression, her lack of memory and concentration, her inability to relate to others, keep schedules, [or] complete tasks prevent her from working." *Id*.

//

//

_Medical Records and Opinion Evidence from Non-Treating Examining Consultants_

In January of 2016, Plaintiff was referred by the state Department of Social Services to Paul Martin, Ph.D., for a consultative psychological examination. _Id_. at 430-36. Dr. Martin's report presents a series of internal inconsistencies and contradictions in that his observations seem unrelated to his conclusions regarding Plaintiff's work-related abilities. Initially, he noted that Plaintiff has developed depression and anxiety, but – rather than ascribing its cause to Plaintiff's status as a war victim, and without any explanation, Dr. Martin's report simply ascribed the cause of the depression and anxiety as being "[d]ue to her medical status." _Id_. at 431. He did note that Plaintiff's depressive disorder causes her to experience low energy, poor motivation, social withdrawal, anhedonia, chronic fatigue, crying spells, feelings of guilt, frustration, and even passible suicidal ideations (with no means, plan, or intent). _Id_. However, despite this, Dr. Martin chose not to explore Plaintiff's depression or trauma related disorders by, for example, delving into the wartime events that caused her trauma-related disorders, or administering diagnostic instruments geared towards quantifying depressive and anxiety-related disorders (such as the Beck's Depression or Anxiety Inventories). _See id_. at 430-31. Instead, and despite noting that Plaintiff "reported as a child having a history of traumatic experiences, related to war-torn Afghanistan," Dr. Martin's evaluation and report were almost exclusively focused on Plaintiff's cognitive, rather than emotional, capacity to function. _Id_. (listing the only diagnostic instruments employed as being limited to an IQ test and memory test).

An administration of the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) – yielded a Full Scale IQ score of 72, meaning that Plaintiff operates in the borderline range of intellectual function. _Id_. at 433-34. Another strong indicator of the incompleteness of Dr. Martin's report was his notation that Plaintiff's IQ score signifies "difficulty of cognitive functioning . . . [and that] [e]motional factors appear to interfere with cognitive functioning." _Id_. at 434. However, without administering any diagnostic instruments geared towards identifying and quantifying those "emotional factors," Dr. Martin's report gives rise to far more questions than it answers. In any event, Dr. Martin also found that Plaintiff's memory operates "in the extremely low to borderline range indicating significant difficulties with new learning and memory." _Id_. In similarly

terse fashion, Dr. Martin's report casually noted the presence of certain undescribed and unidentified neurocognitive impairments based on Plaintiff's poor performance on both parts of the Trail Making Test; in this regard, Dr. Martin noted that "[t]hese results indicate that the claimant shows significant difficulty with sustained attention and or mental tracking . . . [which] indicate a likelihood of possible neurocognitive impairment." *Id*. at 434-35. In the end he diagnosed Plaintiff with Major Depressive Disorder, Pain Disorder, and Anxiety Disorder, while noting that her "[p]sychiatric symptoms might diminish with comprehensive mental health treatment." *Id*. at 435. At bottom, however, and without any explanation whatsoever, Dr. Martin concluded that Plaintiff's conditions only cause mild to moderate limitations in some areas of work-related functioning, and no significant limitations on other areas of work-related functioning. *Id*. at 435-36.

In November of 2016, Plaintiff was referred for an internal medicine evaluation by the state disability agency to Nayyar Masood, M.D., who performed only a physical examination. *See id*. at 487-89. He did, however, note Plaintiff's history of depression, anxiety, Type 2 diabetes, hypothyroidism, lower back pain, arthritic pains (which he attributed to her depression but without any explanation for that conclusion), and from low blood pressure with dizziness due to her history of anemia and menorrhagia. *Id*. at 489. Not unlike Dr. Martin's report, Dr. Masood's report contains some gaps (in that his functional capacity assessment does not account for any of her mental health symptoms) as well as some inconsistencies (in that his functional capacity assessment seems untethered from his examination findings). During his physical examination, Dr. Masood noted that while Plaintiff "can slowly put all four extremities through a full range of motion," she "does complain of aches and pains in all four extremities especially in the shoulders, knees, and lower back." *Id*. at 488. He then observed that "[w]hen she stands and attempts to touch the floor with the tops of her fingers, she stops with her fingers 14" of (sic) the floor complaining of low back pain [and] [e]xtension about the lumbar spine is limited to secondary dizziness." *Id*. He also found that "[s]he could barely make 50% of a full squat holding on to the table." *Id*. at 489. Nevertheless, without any explanation, Dr. Masood concluded his report as such: "I think in an eight-hour workday, the claimant could stand and/or walk cumulatively, for up to six hours a

day with usual breaks, mostly on level ground, walking at her own pace, based on her endurance. She could probably sit up to six hours a day with usual breaks [and] [u]sing both hands, she could lift, push or pull up to 25 pounds frequently and 50 pounds occasionally." *Id*. at 489.

*Lay Witness Testimony from Plaintiff and her Daughter*

With assistance from her daughter, Plaintiff completed a Function Report in December of 2015. *Id*. at 269-77. The gist of this report is that the combination of the above-described impairments result in her inability to even successfully do light housework, or leave the house with any sense of regularity, or socialize, or enjoy a full night of sleep, or get dressed or bathe without it taking a long time due to persistent pain and dizziness. *Id*. at 269-70, 272-76. On the same date, Plaintiff's daughter also completed a Third Party Function Report, through which she provided her own insights into her mother's overall condition. *Id*. at 280-87. Plaintiff's daughter noted that her mother's depression, anxiety, and fatigue combine to interfere with her ability to communicate, leave the house, handle ordinary stress, sleep, think, digest food, maintain a healthy appetite, remember things, handle more than one task at a time, concentrate and pay attention, comprehend, follow instructions, and handle any changes to her routine. *See id*. at 280, 281, 283, 284-85, 286. Approximately a year later, in September of 2016, Plaintiff and her daughter submitted a second set of Function Reports that largely repeated more or less the same account that they had provided the previous year. *See id*. at 311-18, 321-28.

*Vocational Expert ("VE") Testimony*

The ALJ conducted a hearing on this claim in September of 2018. *See id*. at 43-99. Therein, the VE was asked if a hypothetical person with Plaintiff's education and background would be employable if that person were to miss roughly two days of work in any given month due to psychological impairments. *Id*. at 86-87. The VE answered in the negative, noting that if "somebody were consistently to miss that much work, they would not be able to maintain employment." *Id*. at 87. When asked whether a hypothetical person with Plaintiff's education and background would be employable if they were consistently off-task 20% of the time due to psychological symptoms, the VE once again answered in the negative and noted: "[w]ell, if somebody were off task that much, they would not be able to maintain employment." *Id*. at 94.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ set forth the applicable law under the required five-step sequential evaluation process. *AR* at 28-29. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date on which the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff has not worked since 2002, and that even then, her earnings were still below the threshold that would characterize the work as substantial gainful activity – accordingly, Plaintiff has not engaged in substantial gainful activity since the alleged onset date. *AR* at 29.

At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the following severe impairments: diabetes; generalized myalgias and arthralgias; cartilage loss from patellar medial facet on the left knee and moderate Baker's cyst; Major Depressive Disorder; and Anxiety Disorder. *Id*. at 29. As to Plaintiff's anemia, the ALJ concluded (without explanation) that it does not cause any significant functional limitations or more than minimally affect Plaintiff's ability to perform basic work activities. *Id*. The ALJ failed to consider, or even mention, Plaintiff's Esophageal Reflux Disease

and Menorrhagia at Step Two at all.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 30-31. Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of work at the medium exertional level – specifically, that she can sit for 6 hours in an 8-hour workday with usual breaks; that she can stand and / or walk for 6 hours in an 8-hour workday with usual breaks; that she can lift and / or carry 25 pounds frequently and 50 pounds occasionally; that she has no limits in fine finger and hand movements; but, that she cannot work around heights or machinery. *Id*. at 31-35. In this regard, the ALJ added that "[m]entally, the claimant can perform simple routine tasks in a low stress environment (no fast-paced production quotas, no piecemeal work, few decisions, and few changes in workplace or tasks)." *Id*. at 31-32.

At Step Four, the ALJ determined that Plaintiff is unable to perform her past relevant work due to the fact that she has no past relevant work. *Id*. at 35. Lastly, at Step Five, the ALJ concluded, based on the RFC, Plaintiff's age, education, and the VE's testimony, that there are jobs that exist in significant numbers which Plaintiff could perform – namely, the ALJ found that Plaintiff could work as a kitchen worker, a house cleaner, or a bagger. *Id*. at 35-36. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act. *Id*. at 36.

## DISCUSSION

Based on the record as described above, Plaintiff submits that due to the ALJ's improper weighing of the evidence, this case satisfies the conditions of the credit-as-true doctrine because the ALJ failed to provide legally sufficient reasons for rejecting this evidence; because, when properly credited, the evidence would require the ALJ to find Plaintiff disabled on remand;

United States District Court
Northern District of California

United States District Court
Northern District of California

1   because there are no outstanding issues that need to be resolved before a disability determination

2   may be rendered; and, because a review of the record as a whole does not give rise to any serious

3   doubt that Plaintiff is, in fact, disabled. *See* Pl.'s Mot. (dkt. 23) at 28-30. Defendant disagrees in

4   all respects and submits that the ALJ committed no reversible error whatsoever. *See* Def.'s Mot.

5   (dkt. 26) at 3-11.

6         The ALJ committed no shortage of errors in the handling of this case. Initially, the court

7   must note that the ALJ erroneously concluded that Plaintiff's anemia is non-severe because it

8   supposedly causes no significant functional limitations and that it only minimally effects

9   Plaintiff's ability to work. *AR* at 29. However, elsewhere in the opinion, the ALJ plainly notes that

10  "Anemia affects her ability to work because she is dizzy and cannot concentrate." *See id*. at 32. As

11  mentioned, Step two is "a *de minimus* screening device [used] to dispose of groundless claims."

12  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Therefore, "applying our normal standard

13  of review to the requirements of step two, [the Court] must determine whether the ALJ had

14  substantial evidence to find that the medical evidence clearly established that [Plaintiff] did not

15  have a medically severe [anemia] impairment." *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir.

16  2005). Aside from the internal contradiction in the ALJ's report (claiming at one point that

17  Plaintiff's Anemia does not affect her ability to work, *see AR* at 29, and then suggesting elsewhere

18  that it does, *see id*. at 32), the record contains a great deal of medical evidence regarding the

19  effects of Plaintiff's anemia, while containing no support at all for the ALJ's conclusion that the

20  condition is non-severe. *See id*. at 485, 492, 641-53 (Dr. Bhandari found that Plaintiff's Arthritis,

21  *Anemia*, and Esophageal Reflux Disease, having persisted for 15 years, combine to result in a host

22  of work-related postural limitations); *see also id*. at 489 (Dr. Masood concluded that Plaintiff's

23  persistently low blood pressure and her chronic dizziness are due to her history of *anemia* and

24  Menorrhagia). Accordingly, the ALJ erred in labeling Plaintiff's anemia as non-severe, and failing

25  to take it into account at Step Two and beyond. The same is true for Plaintiff's esophageal reflux

26  disease and her menorrhagia. These conditions were not considered elsewhere in the sequential

27  evaluation process; they are, therefore, not harmless errors.

28        Even if one were to overlook the ALJ's errors at Step Two, a review of the ALJ's opinion

in light of the evidentiary record in this case (as summarized above) reveals that the ALJ's non-disability finding was erroneous because it was based on an improper weighing of the evidence where the ALJ erroneously rejected the findings and opinions of Dr. Bhandari (a treating physician with a 20-year treatment relationship with Plaintiff) while adopting the internally inconsistent and incomplete opinion rendered by Dr. Martin, as well as the opinion of Dr. Masood (which was limited to Plaintiff's physical abilities). *See AR* at 34-35. In rejecting Dr. Bhandari's work-preclusive opinions related to the symptoms and effects of Plaintiff's major depressive disorder and anxiety disorder, the ALJ offered nearly nothing by way of explanation. *See id*. at 33-34. Other than some brief discussion of hemoglobin levels and knee cartilage, the ALJ stated only (in conclusory fashion) that "a careful review of [Dr. Bhandari's] treatment records in the file [] does not show that these limitations are supported . . . [because] [t]hese records consist of routine treatment notes that mostly document subjective complaints such as knee pain, low back pain, and lightheadedness / dizziness . . . with little in the way of *objective physical examination* findings . . . [therefore] I do not find that the evidence supports limiting the claimant to less than medium level work activity." *Id*. at 33-34 (emphasis supplied).

This approach is misguided, however, because no amount of "objective physical examination findings" would reveal the limiting effects of emotional disorders such as depression and anxiety. Indeed, this error in reasoning occurs so frequently that it has led to a wealth of authority repeatedly explaining the flaw in SSA's penchant for dismissing the opinions of treating physicians regarding the effects of mental illnesses because those opinions relied in some part on self-reports. In short, it is now axiomatic that mental health evaluations "will always depend in part on the patient's self-report" because "'unlike a broken arm, a mind cannot be x-rayed.'" *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987)). Accordingly, "the rule allowing an ALJ to reject opinions based on self-reports [about physical impairments] does not apply in the same manner to opinions regarding mental illness." *Buck*, 869 F.3d at 1049. Moreover, an ALJ may not reject a medical source opinion because it is based on the claimant's self-reports when the medical source analyzes those self-reports using objective measures such as a clinical interview and mental status examinations. *Id*. In

1    any event, having rejected Dr. Bhandari's opinions, the ALJ based the RFC entirely on a synthesis

2    of the opinions rendered by the consulting examiners, Drs. Masood and Martin. *See AR* at 33, 34.

3        Medical opinions are "distinguished by three types of physicians: (1) those who treat the

4    claimant (treating physicians); (2) those who examine but do not treat the claimant (examining

5    physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."

6    *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating

7    provider is given "controlling weight" so long as it "is well-supported by medically acceptable

8    clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

9    evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels v. Berryhill*,

10   874 F.3d 648, 654 (9th Cir. 2017). In cases where a treating doctor's opinion is not controlling, the

11   opinion is weighted according to factors such as the nature and extent of the treatment

12   relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-

13   (6); *Revels*, 874 F.3d at 654.

14       "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must

15   state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of*

16   *Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*,

17   427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted

18   by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate

19   reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see*

20   *also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating

21   doctor's credible opinion on disability are comparable to those required for rejecting a treating

22   doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough

23   summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof,

24   and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v.*

25   *Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician

26   cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either

27   an examining physician or a treating physician." *Lester*, 81 F.3d at 831; *see also Revels*, 874 F.3d

28   at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*,

United States District Court
Northern District of California

1    169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir.

2    1993). In situations where a Plaintiff's condition progressively deteriorates, the most recent

3    medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

4         It will not be necessary to determine whether or not the later-rendered findings and

5    opinions of Dr. Bhandari were "contradicted" by the earlier-rendered opinion of the consultant

6    psychologist (Dr. Martin) or the consultant internist (Dr. Masood) because the ALJ's explanations

7    for rejecting Dr. Bhandari's opinions did not even rise to the standard of specific and legitimate

8    reasons supported by substantial evidence. This is so because, in light of the record as a whole (as

9    described in detail above), it cannot be reasonably suggested that the outlier and conclusory

10   opinion of Dr. Martin (attended as it was by internal contradictions), by itself, constitutes

11   "substantial evidence." Or, put another way, it is simply not possible to reasonably contend that

12   "the nature and extent of the treatment relationship, as well as the consistency of [Dr. Bhandari's]

13   opinion with the [overall] record" (*see Revels*, 874 F.3d at 654), allowed for the ALJ to reject that

14   opinion in favor of Dr. Martin's earlier-rendered and internally inconsistent opinion that seems to

15   have been based on an incorrect focus on Plaintiff's cognitive, rather than emotional, impairments.

16   Aside from the improper rejection of Dr. Bhandari's opinions, there is an independent error in

17   giving controlling weight to the opinions of Drs. Masood and Martin as it relates to Plaintiff's

18   major depressive disorder, her anxiety disorder, and her PTSD. The opinions of these consultant

19   examiners are outliers in this record and they do not constitute "substantial evidence" because it

20   cannot be reasonably suggested that those opinions are "such relevant evidence as a reasonable

21   mind might accept as adequate to support a conclusion" to the effect that Plaintiff's depression,

22   anxiety, and PTSD are attended with so few limitations. *See Biestek*, 139 S. Ct. at 1154. Therefore,

23   since the ALJ improperly rejected Dr. Bhandari's opinions without providing any explanation that

24   can be described as specific or legitimate – let alone being based on substantial evidence in the

25   record – Dr. Bhandari's opinions will now be credited as true.

26        As to Plaintiff's own statements from the two Function Reports described above, as well as

27   her hearing testimony, the ALJ rejected all of those statements by repeating a now-infamous

28   boilerplate statement that ALJs "have used for years." *See Seibel v. Saul*, No. 19-CV-643, 2020

U.S. Dist. LEXIS 63029, at *19 (E.D. Wis. Apr. 8, 2020). In this regard, the ALJ merely stated, "I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." *See AR* at 33. This statement – or a substantially similar version of it – has repeatedly been criticized by reviewing courts as "meaningless boilerplate." *See e.g.*, *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004); *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (holding that this boilerplate fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible); *Minger v. Berryhill*, 307 F. Supp. 3d 865 (N.D. Ill. 2018); *Whyte v. Saul*, No. 18-CV-1274, 2019 U.S. Dist. LEXIS 185830, 2019 WL 5541412, *5 (E.D. Wis. Oct. 25, 2019); *Justin H. v. Berryhill*, No. 2:18CV383, 2019 U.S. Dist. LEXIS 96582, 2019 WL 2417423, *13 (N.D. Ind. June 7, 2019). Furthermore, while objective medical evidence can establish the presence of certain underlying impairments, an ALJ "may not discredit a claimant's [symptom] testimony . . . solely because the [alleged] degree of [those symptoms] . . . [are] not supported by objective medical evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 345, 347 (9th Cir. 1991).

Instead, where an ALJ discredits a claimant's testimony, "clear and convincing" reasons must be provided. *Valentine v. Comm'r*, 574 F.3d 685, 693 (9th Cir. 2009). In this regard, the ALJ's reasoning must be "sufficiently specific" for "a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds." *Bunnell*, 947 F.2d at 345. Because the ALJ's single-sentence boilerplate explanation here failed to meet that standard, the court finds that the rejection of Plaintiff's statements and testimony were error; accordingly, the entirety of Plaintiff's statements (from her Function Reports) and her hearing testimony will now be credited as true.

Similarly, the ALJ improperly also rejected the accounts provided by Plaintiff's daughter in her two Third-Party Function Reports. *See AR* at 34-35. In this regard, the ALJ rejected the

1    entirety of Plaintiff's daughter's account by merely stating that "[t]o the extent that [her]

2    statements suggest that the claimant is unable to perform work under the residual functional

3    capacity determined herein, they are given little weight as inconsistent with the overall evidence of

4    record." *Id*. at 35-36. In order to reject the testimonial statements of a lay-witness, an ALJ must

5    "give[] reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir.

6    2001). The reasons advanced for rejecting lay-witness testimony must also be "specific." *Stout v.*

7    *Comm'r, SSA*, 454 F.3d 1050, 1054 (9th Cir. 2006). Germane reasons for discrediting such

8    testimony could include inconsistency with specifically-identified medical evidence, or the fact

9    that the testimony "generally repeat[s]" the properly discredited testimony of a claimant. *Bayliss v.*

10   *Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). However, it is important to note that the mere lack

11   of support from medical records is not a germane reason to discount lay-witness testimony.

12   *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017). Here, in violation of the holding in *Stout*,

13   the ALJ merely stated that this witness's statements were inconsistent with the overall evidence of

14   record, which fails to clarify *which statements* might be inconsistent with *which evidence*. Despite

15   the failure of the ALJ's explanation to satisfy the legal standards described herein, the ALJ's

16   conclusion was independently incorrect in that Plaintiff's daughter's account was wholly

17   consistent with the overwhelming weight of the evidence of record including Dr. Bhandari's

18   findings and opinions, Plaintiff's own statements, Therapist Zendieh's findings and opinions, and

19   even with large portions of Dr. Martin's report (except his functional capacity assessment).

20   Accordingly, because the ALJ improperly rejected the testimony of Plaintiff's daughter, that

21   testimony will now be credited as true as a matter of law.

22                                              **Nature of Remand**

23        The decision whether to remand for further proceedings or for payment of benefits

24   generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

25   1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

26   been fully developed and where further administrative proceedings would serve no useful

27   purpose." *Smolen*, 80 F.3d at 1292. The Court of Appeals for the Ninth Circuit has established a

28   three-part test "for determining when evidence should be credited and an immediate award of

United States District Court
Northern District of California

benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and, (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The second and third prongs of the test often merge into a single question; that is, whether the ALJ would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison v. Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of benefits is required).

Initially, the court will note that the Appeals Council's rejection of Therapist Zendieh's findings and report was improper. In this regard, the Appeals Council premised its rejection of Therapist Zendieh's findings on the incorrect notion that "[t]his additional evidence does not relate to the period at issue" because the ALJ "decided [the] case through November 23, 2018 [and] [t]his additional evidence does not relate to the period at issue . . . [and] does not affect the decision about whether you were disabled beginning on or before November 23, 2018." *See AR* at 2. This holding is erroneous for several reasons. First, November 23, 2018 was the date on which the ALJ issued an opinion, so that date frames the end, not the beginning, of the relevant period of time under consideration by the Appeals Council. *See id*. at 36. Plaintiff's application date was October 28, 2015, and her alleged onset date (as noted in the ALJ decision) was July 31, 2002. *See id*. at 27. Second, while it is true that Plaintiff's course of treatment with Therapist Zendieh began in December of 2018, a month after the issuance of the ALJ's opinion, the findings and conclusions expressed in Therapist Zendieh's report were clearly retrospective and therefore relevant to the disability time-frame which commenced with Plaintiff's alleged onset date. *See id*. at 14-18. Thus, despite Defendant's incorrect contention that Therapist Zendieh's opinions were "stated in the present [tense]" (*see* Def.'s Mot. (dkt. 26) at 10), Therapist Zendieh's opinion clearly expressed the fact that Plaintiff's severe symptoms and her "long history of depression and

PTST" are rooted in her experiences as a war victim, and that her war-related trauma causes the severity of her symptoms to increase each time she experiences memory triggers such as when she hears current news regarding events in Afghanistan. *See AR* at 14, 17, 18. Because Therapist Zendieh's findings and opinions are focused on Plaintiff's mental health issues that have existed since long before her alleged onset date, the Appeals Council erred in concluding otherwise. Therapist Zendieh's opinions, therefore, should have been considered, and "[w]here the Appeals Council was required to consider additional evidence, but failed to do so, remand to the ALJ is appropriate so that the ALJ can reconsider its decision in light of the additional evidence." *Taylor v. Comm'r of SSA*, 659 F.3d 1228, 1233 (9th Cir. 2011). Therefore, because this is evidence that would also have to be considered by the ALJ on remand, the court can now include its consideration in the determination of whether the record as it now stands (after application of the credit-as-true doctrine to Plaintiff's statements, the lay witness testimony, and Dr. Bhandari's finding and opinions) would require the ALJ to find Plaintiff disabled on remand and whether or not the record manifests any serious doubts that Plaintiff is in fact disabled. Because the court has already credited Dr. Bhandari's findings and opinion as true, it seems virtually impossible that Therapist Zendieh's overwhelmingly consistent opinion would be legitimately rejected on remand.

In light of the above-discussed and improperly discredited lay-witness accounts and medical opinion evidence, two things are clear: first, it is clear that Plaintiff has in fact been disabled since her alleged onset date, and second, it is clear that further administrative proceedings would be useless because the ALJ would be required to find Plaintiff disabled on remand. Plaintiff's major depressive disorder would compel a disability finding at Step Three because it meets or at least equals (considering her depression in combination with her anxiety disorder, PTSD, borderline intellectual function, and memory function in the extremely low range) the criteria for Listing 12.04(A)(1) (depressive disorder). *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1, §12.04. To satisfy the criteria of Listing 12.04, it is necessary to satisfy the pertinent criteria listed in subparts (A)(1) and (B), or (A)(1) and (C). *See id.* Subpart (A)(1) requires medical documentation of a depressive disorder, characterized by five or more of the following: depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight;

1   sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of

2   guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide.

3   §12.04(A)(1). As discussed above, Dr. Bhandari found that Plaintiff satisfied virtually every factor

4   in Subpart (A)(1) – let alone satisfying 5 out of 9. In fact, even Dr. Martin's report indicated that

5   Plaintiff's depressive disorder causes her to experience low energy, poor motivation, social

6   withdrawal, anhedonia, chronic fatigue, crying spells, feelings of guilt, frustration, and even

7   passible suicidal ideations (with no means, plan, or intent). *See AR* at 431. Therapist Zendieh

8   found that Plaintiff's depression satisfies all four factors in Subpart (B) by concluding that

9   Plaintiff's condition is attended with extreme limitations in all four of the Subpart (B) categories –

10  let alone marked limitations in two of the four. *See id*. at 16-17. Furthermore, even though meeting

11  or equaling Listing 12.04 only requires satisfaction of the pertinent criteria listed in subparts

12  (A)(1) and (B), **or** (A)(1) and (C), Therapist Zendieh also found that Plaintiff's condition satisfies

13  the requirements of Subpart (C). *See id*. at 18. Accordingly, on remand the ALJ would clearly be

14  required to find that Listing 12.04's requirements are, at least, met by Plaintiff's major depressive

15  disorder, let alone being required to find an equivalence in listing-level severity if the combined

16  effects of Plaintiff's limitations are to be fairly considered.

17        The second reason that the record conclusively establishes that Plaintiff has been disabled

18  since her alleged onset date is that the combination of her mental and physical impairments would

19  surely compel a disability finding during the formulation of the RFC – that is, the combined

20  effects of debilitating depression, anxiety disorder, PTSD, borderline intellectual functioning,

21  extreme low range memory function, the unexplored indications of a neurocognitive disorder as

22  mentioned by Dr. Martin (*see AR* at 434-35), diabetes, anemia (causing fatigue and dizziness),

23  bone and cartilage degradation in her spine and knee, and, arthritic pain in her shoulders, elbows,

24  spine, and knees. Additionally, given the fact that the improperly rejected evidence established

25  that the combined effects of Plaintiff's symptoms would see to it that she would miss *more than*

26  four days of work per month, and that for the days she would not be absent she should be expected

27  to be off-task *more than* 30% of the time, the only reasonable conclusion is that she has no

28  residual functioning capacity at all. *See id*. at 647. This conclusion is bolstered by Therapist

United States District Court
Northern District of California

1    Zendieh's finding that Plaintiff's symptoms combine to cause extreme limitations (i.e., a complete

2    "inability to function") in all of the four broad categories of work related functional categories. *See*

3    *id*. at 16-17.

4         Turning to the third and final reason that further proceedings would be futile – when the

5    improperly rejected evidence is given effect, the ALJ would also be required to find Plaintiff

6    disabled at Step Five based on the VE's testimony. The VE testified that someone with Plaintiff's

7    education and background would not be employable if they were to consistently miss as little as

8    two workdays per month, or if they were off-task as little as 20% of the time. *See id*. at 87, 94.

9    Clearly, the same would apply to someone who (as opined by Dr. Bhandari) would be absent more

10   than three days per month (*id*. at 653), while being off-task more than 33% of any given workday

11   (*id*. at 12). Therefore, on remand, Plaintiff would also undoubtedly be found disabled based on the

12   VE's testimony at Step Five.

13        At this juncture, the court will note that in cases where each of the credit-as-true factors is

14   met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a

15   "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing

16   *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances," as the record leaves no

17   room to doubt that Plaintiff has in fact been disabled, at least since her alleged onset date, if not

18   much earlier.[7] Needlessly remanding a disability claim for further unnecessary proceedings would

19   only delay much needed income for claimants such as Plaintiff who are unable to work and who

20   are entitled to benefits; doing so would in turn subject them to "tremendous financial difficulties

21   while awaiting the outcome of their appeals and proceedings on remand." *Varney v. Sec'y of*

22   *Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). The court is satisfied that the ALJ's

23   unsupported conclusions were thoroughly negated by the overwhelming weight of the record

24   evidence which conclusively and convincingly establishes Plaintiff's longstanding disability such

25   _____

26   [7] Defendant incorrectly contends that when Plaintiff stopped working in 2002, it was because her family's
     business closed, not because she became unable to work, as evidenced by the fact that she claimed to have

27   been "taking care of her husband and raising her children." *See* Def.'s Mot. (dkt. 26) at 7. However, this is
     an incorrect characterization of Plaintiff's testimony; in reality, when asked whether she was able to seek

28   employment since 2002, "when the [family] business collapsed," Plaintiff responded: "Even then[,] I
     wasn't feeling well to look for work." *See AR* at 71-72.

United States District Court
Northern District of California

that no further inquiry is necessary.

## CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 23) is **GRANTED**, and Defendant's Cross-Motion (dkt. 26) is **DENIED**. The ALJ's finding of non-disability is **REVERSED**, and the case is **REMANDED** for the immediate calculation and payment of appropriate benefits consistent with the findings and holdings expressed herein.

**IT IS SO ORDERED.**

Dated: September 13, 2021

ROBERT M. ILLMAN
United States Magistrate Judge